## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DARLENE C.,[1] | ) | No. 19 CV 5059 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| ANDREW M. SAUL, Commissioner of | ) | |
| the Social Security Administration, | ) | |
| | ) | November 3, 2020 |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Darlene C. ("Darlene") seeks disability insurance benefits ("DIB") based on her claim that she is disabled because of congestive heart failure, type 2 diabetes, and a foot deformity. Before the court is Darlene's motion for summary judgment. For the following reasons, the motion is denied, and the Commissioner's final decision is affirmed:

### Procedural History

Darlene filed her DIB application in June 2016 alleging a disability onset date of June 14, 2014. (Administrative Record ("A.R.") 162-63.) After her application was denied initially and upon reconsideration, (id. at 102-05, 110-13), Darlene requested and was granted a hearing before an administrative law judge ("ALJ"), (id. at 116-17, 132-38). Darlene appeared for a hearing in September 2017 along with her attorney and a vocational expert ("VE"). (Id. at 38-81.) The ALJ

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect her privacy to the extent possible.

denied the disability application in May 2018. (Id. at 22-33.) When the Appeals Council declined Darlene's request for review, (id. at 1-4), the ALJ's decision became the final decision of the Commissioner, *see Jeske v. Saul*, 955 F.3d 583, 597 n.2 (7th Cir. 2020). Darlene then filed this action seeking judicial review and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 626(c); (R. 6).

## Facts

Darlene had been working as a customer service representative for over a decade when she was laid off on June 12, 2014. (A.R. 45, 187.) She claims that she became unable to work two days later because of her heart condition and diabetes. (Id. at 47-48, 162.)

### A.    Medical Evidence

The medical records Darlene submitted to the ALJ show that she has a history of hypertension, congestive heart failure, and mitral insufficiency. (A.R. 294.) In December 2013 Darlene suffered a heart attack and was hospitalized. (Id. at 333.) At that time, diagnostic imaging and testing showed coronary artery disease. (Id.) To prevent future blockage Darlene underwent a cardiac catheterization procedure, resulting in drug-eluting stent implementation. (Id.) An echocardiogram performed post-stent placement measured Darlene's ejection fraction[2] to be between 45% and 50%. (Id.) Darlene was discharged with heart medication and instructions to see a cardiologist. (Id. at 333-34.)

---

[2] "Ejection fraction is a measurement of the percentage of blood leaving [the] heart each time it contracts." Mayo Clinic, https://www.mayoclinic.org/ejection-

Two years later in November 2015, Darlene began seeing Dr. Kara Davis for primary care treatment. At that time, Darlene reported to Dr. Davis that she had occasional shortness of breath upon exertion and when lying down but denied having any chest pain, shortness of breath when walking, palpitations, or heart murmur. (Id. at 385-87.) She also reported no exercise intolerance, muscle weakness, swelling, or fatigue. (Id. at 387.) On examination, Darlene had elevated blood pressure but otherwise normal respiratory and cardiovascular exams, normal strength, intact sensation, normal gait and station, and no noted edema, swelling, or tenderness. (Id. at 387-88.) The following year in October 2016, exams again showed that Darlene had normal findings except for elevated blood pressure and a single complaint of occasional shortness of breath upon exertion. (Id. at 375-77, 380-82.) Dr. Davis diagnosed Darlene with type 2 diabetes for which she prescribed medication. (Id. at 375.)

On November 20, 2016, Darlene went to the emergency room with complaints of shortness of breath. (Id. at 416.) On examination, Darlene had elevated blood pressure and crackling in the lungs but otherwise normal findings. (Id. at 417.) Diagnostic imaging and testing were consistent with congestive heart failure and an echocardiogram showed that Darlene's ejection fraction had declined to between 25% and 30%. (Id. at 416.) Darlene was treated with medication and released from the hospital the same day with a diagnosis of acute chronic systolic heart failure exacerbation. (Id. at 417.) It was recommended that Darlene wear a cardioverter

fraction/expert-answers/faq-20058286 (last visited October 23, 2020). An "ejection fraction of 50 percent or lower is considered reduced." Id.

defibrillator, avoid pushing, pulling, or lifting anything heavy, and "[a]lways try to raise [her] feet and legs when sitting." (Id. at 400, 417.)

Darlene then saw Dr. Abed Dehnee, a cardiologist. During her second and last visit with Dr. Dehnee on December 19, 2016, Darlene denied chest pain, palpitations, dizziness, edema, or cold intolerance, and reported no medication side effects. (Id. at 448-50.) Dr. Dehnee observed that Darlene's ambulation was normal, as were her cardiovascular and physical exams. (Id. at 449-51.) The following year in March 2017, Darlene visited cardiologist Dr. Ali Kutom. (Id. at 506-08.) Dr. Kutom observed that Darlene was not in acute distress and had no edema, wheezes, murmurs, or peripheral neuropathy. (Id. at 507.) He diagnosed Darlene with chronic essential hypertension, heart failure, and coronary artery disease, and noted that she would need cardiac catheterization prior to getting an implantable cardio defibrillator. (Id. at 507-08.) At her next visit in July 2017 Darlene reported to Dr. Kutom that she was "[d]oing well [and] [t]aking medications without difficulty." (Id. at 505-06.) A September 2017 imaging test showed Darlene's ejection fraction to be 31.5%. (Id. at 509.)

On September 20, 2017, Darlene's primary care physician, Dr. Davis, completed a medical statement in which she opined that Darlene is unable to work because of her medical condition. (Id. at 474.) Dr. Davis stated that Darlene can stand for less than 15 minutes at a time but cannot stand during a workday and can sit for less than 2 hours at a time. (Id.) Dr. Davis also opined that Darlene would be off task for 25% of the time over the course of a workday, can lift up to 5 pounds

occasionally, and can bend, stoop, and balance occasionally. (Id.) On October 8, 2017, Darlene's cardiologist, Dr. Kutom, completed a medical statement regarding heart failure in which he assessed Darlene's heart condition as class II, meaning she has "slight, mild limitation of activity" and is "comfortable with rest or with mild exertion." (Id. at 498.) Dr. Kutom further indicated that Darlene experiences fatigue on exertion and intolerance to cold, is very seriously limited in her activities of daily living and has a decreased ejection fraction. (Id.)

As for Darlene's foot deformity, medical records show that Darlene met with Dr. Johnny Parker, a podiatrist, in September 2017. (Id. at 489-92.) Darlene reported to Dr. Parker that she has painful toenails, heels, corns, and callouses, and pain on palpation and ambulation. (Id. at 489.) The foot exam showed that Darlene has hallux valgus, bunion, hammer digits with edema, decreased sensation, paresthesia, burning, and restricted joint motion. (Id. at 490-92.) Dr. Parker assessed Darlene as having plantar fasciitis, painful limb, abnormal gait, heel pain, difficulty walking, and a foot deformity, for which he recommended custom orthopedic shoes, foot padding and strapping, and ointment. (Id. at 488, 492, 494-95.) Foot and ankle x-rays revealed unremarkable bilateral feet and ankle joints with a small calcaneal spur on the left foot. (Id. at 483-84.)

## B. Hearing Testimony

Darlene testified that she stopped working in June 2014 because the department in which she worked closed. (A.R. 47.) She said that she took time off after her heart attack in December 2013 and did not return to full-time work before

being laid off because she was fatigued and experienced lightheadedness. (Id. at 57-59.) She also said her heart condition and diabetes prevented her from pursuing other employment, though she certified that she could work full time in order to receive unemployment. (Id. at 47-48.)

Regarding her heart condition, Darlene testified that she has trouble concentrating and regularly experiences arrythmia, irregular heartbeats, chest pains, and dizziness. (Id. at 48-49, 60.) She said that she has to lie down for a couple of hours a day because of her medication, and when she lies down, she has to keep her feet elevated. (Id.) Typically, she elevates her feet for at least six hours out of an eight-hour day. (Id. at 54.) Darlene explained that if she does not elevate her feet, she experiences shortness of breath and foot pain. (Id. at 62-63.) She testified that she takes medication for diabetes and that this condition does not affect her ability to work. (Id. at 53-54.) Darlene also said that as part of her treatment she wears a cardioverter defibrillator 24 hours a day and follows a special diet 90% of the time. (Id. at 48-51.)

In describing her foot problems, Darlene testified that she only recently started seeing a podiatrist for foot pain. (Id. at 52-53.) She said that she cannot walk and has to keep her feet elevated because of the pain. (Id. at 51.) Darlene testified that she has poor circulation and a foot deformity, requiring her to wear therapeutic shoes and foot wraps. (Id. at 51, 53, 76.) She said that she feels better when she does not wear shoes. (Id. at 76.)

As for daily activities, Darlene testified that she drives and manages her personal care but her daughter cooks and does the household chores. (Id. at 45, 56.) She said that she leaves the house three or four times a month to visit family and spends her days reading or watching television. (Id. at 57, 60.) She also said that she becomes winded after walking one block and then needs to rest for 15 minutes. (Id. at 61.) She testified that she can lift and carry less than 10 pounds. (Id. at 65.)

**C.    The ALJ's Decision**

The ALJ followed the required five-step process in evaluating Darlene's disability claims. *See* 20 C.F.R. § 404.1520(a). At step one the ALJ found that Darlene had not engaged in substantial gainful activity since June 2014. (A.R. 24.) At step two the ALJ concluded that Darlene has the severe impairments of coronary artery disease, acute myocardial infarction, hypertension, calcaneal spurs, and plantar fasciitis. (Id. at 25.) At step three the ALJ determined that Darlene's impairments do not meet or medically equal any listed impairment. (Id.) Before turning to step four, the ALJ assessed Darlene as having a residual functional capacity ("RFC") to perform sedentary work with the following limitations: she can lift and carry 10 pounds occasionally and less than 10 pounds frequently; she can sit for six hours, stand for two hours, and walk for two hours; she can push and pull as much as she can lift and carry; she can frequently operate foot controls with either foot; she can frequently climb ramps and stairs, and occasionally climb ladders, ropes, or scaffolds; she can occasionally stoop, kneel, crouch, and crawl; and she can occasionally work at unprotected heights. (Id. at 26.) At step four the ALJ found

that Darlene's RFC permitted her to perform her past work as a user support analyst as she actually performed it and as generally performed. (Id. at 32-33.)

## Analysis

Darlene argues that the ALJ erred by: (1) assigning "no weight" to the opinions of her treating physicians; (2) finding at step two that her type 2 diabetes is not a severe impairment; and (3) discounting her subjective symptom allegations. In reviewing the ALJ's decision this court analyzes whether the decision is free from legal error and supported by substantial evidence. *Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation marks and citation omitted). In conducting its review, the court will not substitute its judgment for the ALJ's or reweigh the underlying evidence. *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). If the ALJ's decision is supported by substantial evidence the court must affirm it, though reasonable minds could disagree as to whether the claimant is disabled. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## A.    Step-Two Analysis

The court begins with Darlene's challenge to the ALJ's step-two finding. Specifically, Darlene takes issue with the ALJ's finding that her diabetes does not cause more than minimal limitations in her ability to perform basic work. (R. 12, Pl.'s Mem. at 10.) In explaining that Darlene's diabetes and peripheral neuropathy were not severe impairments, the ALJ noted that Darlene testified at the hearing

that her diabetes does not impact her ability to work.  (A.R. 25.)  Additionally, the ALJ reasoned that despite Dr. Parker's notations during a foot exam in September 2017 that Darlene had decreased bilateral foot sensation, other treatment records show that she had "normal sensation."  (Id.)  There also were "no noted motor, strength or sensory deficits."  (Id.)  Finally, the ALJ observed that Darlene did not seek "aggressive" treatment for her diabetes and peripheral neuropathy.  (Id.)

Darlene ignores her own testimony and argues that the ALJ's step-two finding is flawed because "diabetes can cause or contribute to [her] medical impairments of peripheral neuropathy and cardiomyopathy."  (R. 12, Pl.'s Mem. at 10.)  She claims that the ALJ ignored Dr. Parker's diagnosis of diabetic neuropathy with symptoms including paresthesia and numbness of the feet and toes, burning sensations, edema, and abnormal proprioception, as well as his notes documenting her difficulty walking and antalgic gait.  (Id.)  According to Darlene, her inability to walk properly "would have more than a minimal impact" on her ability to perform basic work.  (Id.)  The government responds that the ALJ reasonably relied on Darlene's hearing testimony, adequately discussed Dr. Parker's findings, and appropriately considered Darlene's course of treatment in making her step-two finding.  (R. 22, Govt.'s Mem. at 2.)  Regardless, the government argues that any step-two error was harmless because the ALJ appropriately considered Darlene's allegations of difficulty walking in crafting her RFC.  (Id. at 3-4.)

The court agrees with the government and finds that the ALJ supported her finding with substantial evidence that Darlene's diabetes is not severe.  First,

Darlene herself testified that her diabetes does not affect her ability to work. (A.R. 53-54.)  Additionally, the record reflects only one exam during which Darlene exhibited abnormal ambulation and sensory deficits in her feet, with most exams noting normal ambulation, gait, station, and motor strength, and no edema.  (See, e.g., id. at 377, 388, 417, 419, 429, 449, 467, 492.)  Contrary to Darlene's assertion, the ALJ discussed the abnormal findings, acknowledging that a foot exam revealed decreased bilateral foot sensation.  (Id. at 25.)  But looking at the record as a whole, the ALJ determined that Darlene's treatment for her diabetes has been conservative, consisting primarily of medications and custom orthopedic shoes.  (See id. at 379, 494-95, 497.)  Darlene does not point to any evidence that her treatment was more aggressive.

Even so, an error at step two may be harmless if the ALJ considers the aggregate effects of all of the claimant's severe and non-severe impairments when determining the RFC.  *See Curvin v. Colvin*, 778 F.3d 645, 648-49 (7th Cir. 2015). Here the ALJ found that Darlene has the severe impairments of cardiovascular disease, hypertension, calcaneal spurs, and plantar fasciitis, and went on to explain the effects those impairments and the non-severe impairments identified at step two, including diabetes, have on her functioning.  (A.R. 25-32.)  To the extent Darlene's diabetes is linked to her neuropathy and further impacts her ability to ambulate, the government is correct that the ALJ included in her RFC assessment limitations to address this combination of impairments.  (Id. at 31.)  Accordingly, the court finds no basis for remand in the ALJ's step-two analysis.

### B.      Treating Physicians' Opinions

Darlene challenges the ALJ's decision to assign "no weight" to the opinions of her primary care physician, Dr. Davis, and her treating cardiologist, Dr. Kutom. (R. 12, Pl.'s Mem. at 6-8.)  An ALJ who declines to give controlling weight to the opinion of a treating physician must provide "good reasons" to support how much weight, if any, she assigned to it.[3]  20 C.F.R. § 404.1527(d)(2); *see Eakin v. Astrue*, 432 Fed. Appx. 607, 612 (7th Cir. 2011).  In doing so, the ALJ must consider certain regulatory factors, such as the length, nature, and extent of the treatment relationship, the physician's specialty, the supportability of the physician's opinion, and the opinion's consistency with the record.  20 C.F.R. § 404.1527(c); *see also Collins v. Berryhill*, 743 Fed. Appx. 21, 24 (7th Cir. 2018).  So long as the ALJ considered these factors and "minimally articulated" her reasons for discounting the treating physician's opinion, her decision will stand.  *Elder*, 529 F.3d at 415.

Darlene argues that the ALJ failed to provide good reasons for assigning no weight to Dr. Davis's and Dr. Kutom's opinions.  (R. 12, Pl.'s Mem. at 6.)  She claims that the ALJ "cherry-picked" treatment notes indicating that there was "no acute process" without acknowledging findings documenting the chronic nature of her condition.  (Id. at 6-7.)  Darlene further claims that the ALJ "played doctor" and independently evaluated the medical evidence.  (Id. at 7-8.)  The government responds that the ALJ did not play doctor but rather appropriately weighed the

---

[3]  New regulations went into effect on March 27, 2017, eliminating the treating physician rule.  *See* 82 Fed. Reg. 58844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017).  However, Darlene filed her DIB application before the effective date so the prior rules in 20 C.F.R. § 1527 apply here.

treating physicians' opinions against conflicting medical evidence in the record. (R. 22, Govt.'s Mem. at 4-5.) The government also argues that the ALJ properly considered the checklist factors in the applicable regulation, 20 C.F.R. § 404.1527(c), and satisfied the "lax" standard of review by which this court is bound. (Id. at 5-6.)

The court agrees with the government, finding that the ALJ adequately considered the Section 404.1527(c) factors and evidence of record and provided good reasons why she accorded no weight to Dr. Davis's and Dr. Kutom's opinions. As to Dr. Davis, the ALJ noted her treatment relationship as Darlene's primary care provider, but also noted the lack of consistency between Dr. Davis's September 2017 opinion and the medical evidence in the record. (A.R. 32.) For example, although Dr. Davis opined that Darlene has disabling limitations, treatment records showed that Darlene had "normal lung, heart, abdominal, and extremity exams." (Id. at 29.) Darlene also had "no edema, a supple neck, full ranges of extremity motion, [and] no peripheral neuropathy." (Id.) Furthermore, there was "no noted motor, strength, sensory, arm/hand use, or gait deficit or abnormality" in the treatment records. (Id.)

At the same time, the ALJ acknowledged treatment records showing that Darlene had an ejection fraction of 31.5% in October 2017 and elevated blood pressure during exams in 2017. (Id. at 32.) The ALJ balanced this evidence against treatment records showing "a broad range of normal findings" and determined that on the whole it did not support Dr. Davis's opinion that Darlene is unable to work. (Id.) Darlene does not point to any "non-acute findings" in Dr. Davis's treatment

records that the ALJ ignored in arriving at this conclusion. (R. 12, Pl.'s Mem. at 7.) Moreover, Darlene's argument that the ALJ ignored her hypertension and heart disease is belied by the record. (Id. at 6-7.) The ALJ clearly considered both impairments, finding them to be severe but not disabling. (A.R. 25, 27-32.)

Regarding the opinion of Dr. Kutom, the ALJ acknowledged that Dr. Kutom is a specialist. (Id. at 32.) The ALJ also noted, however, that Dr. Kutom had a "short and sporadic" treatment relationship with Darlene. (Id.) Indeed, Dr. Kutom saw Darlene only twice (in March and June 2017) before rendering his October 2017 opinion, and treatment notes from these two visits document normal findings, (see id. at 505-08), which is consistent with other treating providers' findings. Darlene complains that the ALJ failed to pay sufficient attention to Dr. Kutom's notes that Darlene was wearing a cardioverter defibrillator and would need cardiac catheterization. (R. 12, Pl.'s Mem. at 7.) But the ALJ discussed this evidence earlier in her decision, noting that Darlene was "treatment non-compliant" because "she was not wearing her LifeVest in July 2017" and "was a 'no show' to cardiac catheterization appointments in 2017." (A.R. 30.)

As to the supportability of Dr. Kutom's opinion, the ALJ noted that Dr. Kutom "failed to set forth objective findings in support of his opinion" other than Darlene's ejection fraction. (Id. at 32.) Darlene offers no additional examples of objective findings supporting Dr. Kutom's opinion that Darlene experiences fatigue on exertion and intolerance to cold and is seriously limited in activities of daily living. (R. 12, Pl.'s Mem. at 7.) Finally, the ALJ noted that Dr. Kutom did not opine

on any specific functional limitations. (Id.) As such, the ALJ provided good reasons that are "sufficiently specific" to allow the court to understand the weight the ALJ assigned to Dr. Davis's and Dr. Kutom's opinions and the reasons for that weight. *See Eakin*, 432 Fed. Appx. at 612 (quoting 20 C.F.R. § 404.1527(d)(2)).

In her reply, Darlene asserts that the ALJ gave short shrift to the treatment relationship between Darlene and her treating physicians. (R. 24, Pl.'s Reply at 5.) She argues that Dr. Davis's opinion was entitled to the additional weight that is generally afforded to a treating source with a longer-lasting physician-patient relationship. (Id.); *see* 20 C.F.R. § 404.1527(c)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion."). She also argues that the ALJ was compelled by the regulations to give Dr. Kutom's opinion more weight because he is a specialist. (Id.) While Darlene is correct that these factors do not strongly support the weight given to Dr. Davis's and Dr. Kutom's opinions, the ALJ gave other good reasons for discounting their opinions and the court will not reweigh the evidence or second guess the ALJ's evaluation. *See Summers*, 864 F.3d at 526. For these reasons, the court finds that the ALJ did not err by discounting the treating physicians' opinions.

C.    **Symptom Assessment**

Darlene argues that the ALJ erred in assessing alleged symptoms resulting from her heart condition and foot deformity.[4]  (R. 12, Pl.'s Mem. at 8-10.)  The government responds that the ALJ considered a number of factors in the applicable regulation, 20 C.F.R. § 1529(c), and appropriately found that while Darlene is limited by her impairments, they do not preclude her from performing sedentary work.  (R. 22, Govt.'s Mem. at 8-11.)  Subjective symptom assessments are accorded great deference because ALJs are in a special position to hear, see, and assess witnesses.  *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014).  Therefore, the court will not disturb an ALJ's symptom evaluation unless it is patently wrong.  *Id.* at 816.

Here the ALJ found that despite Darlene's allegations of an irregular heartbeat, chest pains, dizziness, shortness of breath, difficulty concentrating, and an inability to walk, the objective medical evidence reveals generally normal findings and a conservative course of treatment.  (A.R. 28.)  The ALJ acknowledged that Darlene experienced an exacerbation of her heart condition in November 2016 but explained that, thereafter, the records from treating physicians, including those from Dr. Kutom, "reflect minimal findings."  (Id. at 29.)  To be sure, at follow-up visits in November and December 2016, Darlene denied having palpitations,

---

[4] The court does not address Darlene's single-sentence argument raised for the first time in her reply that the ALJ used "meaningless, boilerplate language" in her symptom assessment.  (R. 24, Pl.'s Reply at 3); *Frazee v. Berryhill*, 733 Fed. Appx. 831, 834 (7th Cir. 2018) (waiving underdeveloped argument presented for first time in reply brief).

dizziness, syncope, edema, medication side effects, chest pain at rest, or intolerance to cold. (Id. at 428-33, 448-53.) Likewise, in 2017 she indicated that she was "[d]oing well [and] [t]aking medications without difficulty." (Id. at 505.) As for Darlene's foot problems, the ALJ noted that her x-rays were unremarkable as to her joints with only left-sided calcaneal spurs, and exams revealed minimal findings with normal strength and range of motion and negative testing for foot conditions. (Id. at 30.)

Darlene objects to the ALJ's purported reliance on the lack of acute findings, arguing that the ALJ ignored objective medical evidence that supports Darlene's position. (R. 12, Pl.'s Mem. at 9-10.) Specifically, she points to her ejection fraction, which was 31.5% in October 2017, and states that a low fraction is known to cause shortness of breath, swelling of the feet or lower legs, fatigue, and a rapid, forceful, and uncomfortable heartbeat. (Id. at 9.) But the government is correct that just because a low fraction can involve these symptoms does not demonstrate that Darlene suffers from them. (R. 22, Govt.'s Mem. at 22 (citing *Schmidt v. Barnhart*, 395 F.3d 737, 745-46 (7th Cir. 2005) (rejecting claimant with irritable bowel syndrome's assertion that because "IBS is known to cause fatigue" she also suffered from fatigue)).) Indeed, the ALJ reasonably concluded after reviewing the objective medical evidence that Darlene's symptom allegations concerning her heart condition are not borne out by the findings documented in her treatment notes. *See* 20 C.F.R. § 404.1529(c).

16

Despite Darlene's claims that she spends her day either lying down or sitting with her feet elevated, seldom leaves her home, and does not cook or do household chores, the ALJ found that Darlene performs a "wide variety of activities," including managing her personal care with no problem, driving, reading, watching television, and spending time with family. (A.R. 31; see also id. at 45, 56-57, 60.) The ALJ further noted that Darlene reported she can pay attention for "long periods of time," handle money, and follow written and spoken instructions. (Id. at 31; see also id. at 232-40.) Regarding Darlene's assertion that she has to elevate her feet, the ALJ explained that this recommendation appeared only in hospital discharge instructions from the November 2016 stay, and Darlene made no such reports to her medical providers regarding the same. (Id. at 30-32.) The ALJ explained that Darlene's "actions and admissions reveal that she is not as limited as she alleged." (Id. at 31.) Also, contrary to Darlene's assertion, the ALJ did not over-emphasize her daily activities by equating them with the ability to perform full-time work. *See Kuykendoll v. Saul*, 801 Fed. Appx. 433, 439 (7th Cir. 2020) (finding ALJ's assessment that claimant's activities suggest he is not as limited as "one would reasonably expect" was "hardly equating the activities with the ability to work full time"). Rather, she appropriately considered Darlene's daily activities, combined with all other evidence of record, in evaluating the severity of her alleged symptoms.

Finally, the ALJ considered Darlene's work history and course of treatment. (A.R. 30.) The ALJ noted that Darlene stopped working in June 2014 as a result of

a layoff, not because of a disabling condition, and she then certified that she was able to work in order to collect unemployment. (Id.; see also id. at 47.) Notably, Darlene conceded that her declaration that she could work at that time is inconsistent with her assertion in this matter that her heart problems caused her to stop working. (Id. at 47-48.) The ALJ was permitted to consider representations that Darlene made for unemployment compensation. *See Knox v. Astrue*, 327 Fed. Appx. 652, 656 (7th Cir. 2009). The ALJ also properly considered Darlene's conservative treatment, which consisted of taking medications, wearing a cardioverter defibrillator and custom orthopedic shoes, and using foot ointment. (A.R. 30.) At the same time, the ALJ noted Darlene's treatment non-compliance, such as not wearing her cardioverter defibrillator. (Id.) Because the ALJ adequately explained the reasons for discounting Darlene's symptom allegations, the court finds no error in the ALJ's symptom assessment.

Having found no basis for a remand, the court addresses Darlene's final assertion that the ALJ's step-four determination was erroneous because she did not consider the entire record. (R. 12, Pl.'s Mem. at 10-11.) According to Darlene, the ALJ should have found that Darlene is unable to perform substantial gainful activity. (Id. at 11.) But as already discussed the ALJ adequately considered the record and Darlene's symptom allegations. And the fact that the ALJ asked the VE hypothetical questions with additional limitations does not mean that she was required to incorporate those limitations into the RFC. (R. 22, Govt.'s Mem. at 12); *see Kathleen C. v. Saul*, No. 19 CV 1564, 2020 WL 2219047, at *6 (N.D. Ill. May 7,

2020) ("The fact that an ALJ considers adding a mental limitation to an RFC does not establish that such a limitation is ultimately warranted."). In any event, Darlene has not pointed to anything in the record discussing her propensity for absenteeism or off-task behavior. Therefore, the court rejects this cursory argument.

**Conclusion**

For the foregoing reasons, Darlene's motion for summary judgment is denied, and the Commissioner's final decision is affirmed.

ENTER:

_____
**Young B. Kim**
**United States Magistrate Judge**